The first case for hearing is Thomas v. Farmers Insurance Exchange at Stockett 20-3076. Mr. Edelman, we are prepared to hear you when you're ready to go. Thank you, Your Honor, and may it please the Court. Joshua Thomas was discriminated against and then retaliated against for opposing that discrimination. Despite substantial evidence supporting those facts, the trial court granted summary judgment to defendants, and in doing so, misapplied the law as it analyzed the facts. Mr. Thomas has more than enough evidence to take his case before a jury, and he should have been allowed to do so. Now, because this is an appeal of a grant of summary judgment, their view is de novo, and this is an employment discrimination case, so where there's circumstantial evidence, the McDonnell-Douglas burden-shifting standards would apply, but where there's direct evidence, it does not. So, starting first with Mr. Thomas's claim of discrimination based on the failure to promote him, there's both here direct evidence and circumstantial evidence to support the claim. The direct evidence involves a comment by the hiring manager, Mr. Radliff, who stated that he didn't need any more alphas, which referenced Mr. Thomas's failure to conform to sex stereotypes. Well, let me copy there. How does a reference to alphas where he just hired a female for one of the positions lead us to believe that it was a statement discriminating against men who didn't show male characteristics? Well, I think, again, based on the context and the testimony that there is a, you know, again, that it is about a male who fails to show female characteristics rather than a female, and so that is where the understanding comes from. I think that is where there is evidence supporting that that was how it was understood by the plaintiff, and who was one of only two people in the conversation, and so I guess that is where that comes from, and that is, I think that is a reasonable potential for understanding of that statement, and I know the defendant and the district court relied on the Tabor case to try to say that because, you know, there's a different potential meaning to that, that it can't be direct evidence, but in fact, I think that that kind of misstates or misapplies that precedent, because if you look at that case and the others, what those cases are talking about in terms of direct evidence is whether or not there is a clear nexus to the hiring action, and in fact, in the Riggs case, the court talks about the testimony in question, it says that they actually aren't really sure that it is evidence of discrimination, but at the summary judgment stage, we assume that it was unfavorable, and in Riggs, the issue was that there was no connection between the discriminatory statement and the actual adverse job action. Here, the discriminatory statement was made in the context of a meeting about why the promotion was not given, so that nexus is even stronger than Tabor. I mean, it's about, it's really as strong as it possibly can be. Well, counsel, nobody's saying there's not a nexus because it was stated, at least there's evidence, it was stated during the interview, but that doesn't make a direct evidence. It's direct evidence if you need, draw no inferences, that it's a direct evidence of discrimination. Here, you have to draw an inference, don't you? Well, so again, I think the statements in Tabor that you need to draw no inference, I think are sort of general statements, and Tabor doesn't deal with, for example, the question of a statement that could be seen as non-discriminatory, and so the extent that that is the precedent, I would argue that in Tabor that that's fictive. Well, let's just talk about the meaning of inference and direct. Would you agree that this statement is susceptible to more than one interpretation? Yes, yeah. So you have two interpretations, interpretation one, interpretation two, and you have to decide which one you're going to accept, which is drawing inferences. Doesn't that necessarily mean it's not direct evidence? So, again, I don't think so. I think that there is that general statement in Tabor, but that's inconsistent with, again, for example, the statement in Riggs that says that at summary judgment, we assume that the statement was unfavorable. What about Vaughn versus Epworth-Villa? I mean, that's this court, and we said that a statement was not direct evidence of retaliation because it could be interpreted benignly. So, again, I don't have that case in front of me, but I, you know, in all of the, what I do recall is in reviewing all these cases, I don't, and maybe I missed the Vaughn case, but I don't believe that any of them were really this situation where, you know, again, while it talks about those circumstances, the actual case law hasn't really directly decided that question, and maybe Vaughn did, and I missed that, and I apologize if that's the case. Let's assume for a minute that we're not dealing with direct evidence. So, turn to the McDonnell-Douglas framework. Yes. Okay. The district court assumed a prima facie case and said there was, and you admitted, as best I can tell, a proffer of a non-discriminatory reason, and so the burden is on you to show pretext. Yes. Could you focus on what evidence you have, what evidence you came forward with of pretext, if that's okay with my colleagues? Yes, absolutely, Honor, and there was quite a bit of it. So, one of the, again, so pretext is established by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions, and that's from the Bennett case, and so there were a number of examples of that. So, the reasons that were given at this meeting are different from the reasons that are now being stated, so that's one form of the hiring manager, Radliff, said that plaintiff lacked leadership quality, but it was later admitted that it wasn't a leadership position, and that, in fact, in the evaluation, he checked a box saying that plaintiff had demonstrated leadership qualities. Additionally, the fact that Radliff didn't want to give this feedback in person, and this is important to the point that the evidence has to be looked at as a whole, and so there's a pattern here. There's multiple instances where there's these extensive conversations on the various online or chat kind of devices that people at the company use to communicate, and then all of a sudden, they want to go off of these, and then something discriminatory happens, and from that, I think, again, that creates the inference of there was something going on here. There was, you know, there is a question of why he didn't want that in writing, and so, and again, I think where the district court really erred was to take each piece of well, this doesn't quite come to the level of pretext. This doesn't quite come to the level of pretext. This doesn't quite come to the level of pretext, but when it's looked at as a whole, I think it pretty clearly does meet the standard, and also, you know, there's this language about that, you know, the court is not supposed to be a super HR department or to question the business judgment, but that's not at all what plaintiff is arguing. Plaintiff very consciously didn't say, oh, he was the best candidate for the job. It said, here's the reason. Here's where that's inconsistent with other statements or information, and so that's really what we focused on and what we, I believe, what we've produced evidence of, and I think the same is true, again, with the, on the retaliation case with the final written warning, there was, again, I think that there was a primary case that wasn't even disputed, and then there was, again, evidence of pretext. There were multiple things, the timing of it, of the final written warning, this implausibility and consistency where, you know, the statements about his failure to take feedback came almost immediately after comments about how great he was at taking feedback, and that, again, is, we're not saying, you know, feedback's not important. Taking feedback is important. We're not saying, you know, that he, you know, that this wasn't really, this shouldn't have been the basis for a final written warning. What we're saying is, they're saying these inconsistent things, right, and that's exactly what the case law says is what we're supposed to bring forward, you know, and again, there's a, right, you know, there's another statement where defendant says, well, there's this issue of whether he created a negative environment for his co-workers, and we say that, well, there wasn't any evidence of that, you know, the court has complained, and defense says, well, plaintiff's supervisor decided to judge that that was the case, and only cites to the write-up itself, and seems to be suggesting that that's sort of, you know, we have to just go along with what the supervisor says. If the supervisor says that this is what they thought, that's what they thought, but that, again, I think is... Isn't that really the stand? I mean, we're not supposed to second guess what management thought. We're supposed to look at whether they truly believed it. They can be wrong, so long as they are acting with a valid belief. They can, but I think the way that we would show that they don't have a valid belief, you know, again, unless there's a lot of case law that says, well, most of the time, they're not going to come out and say, hey, I was lying, hey, I'm discriminating, so the way that you show that it was wrong is you would say, well, I don't, you know, how would they even have a basis for doing this? So they could have come along and say, oh, well, the reason we thought this was X, Y, and Z, right, but if they just outright state it, then I think you can... There is at least evidence that they don't really believe it if there's no basis for them to believe it. I, you know, I think that's sort of the only way that you would show that, other than, you know, if you could catch them making inconsistent statements. Again, I think there's also pretext for the termination. And then, if it's all right with you, I'd like to reserve the remainder of my time for rebuttal. Very well. Mr. Holland, please proceed when you're ready. Thank you, Judge. May it please the Court. This is a Title VII case in which the plaintiff is informed that he was not able to conform to male sex stereotypes and then retaliated against him by issuing him a final warning and ultimately terminating his employment. However, the plaintiff has offered absolutely no viable evidence to support any of these allegations. Throughout his deposition, the plaintiff conceded that his claims were based on no evidence at all or nothing more than speculation and conjecture. And in response to the summary judgment, plaintiff attempted to disguise the admissions by offering over 100 largely immaterial facts that the District Court properly considered and properly viewed and then ended up granting summary judgment, and that decision should be affirmed by this Court. It wasn't addressed by plaintiff, but just very briefly, it was something that was mentioned in the briefing, so I want to make sure that the Court understands our view on this, is that the Supreme Court's decision in Bostock has, from no bearing on this case at all. Bostock simply allows a plaintiff to prove sex discrimination by showing discrimination based on his or her sexual orientation. Plaintiff has not alleged in this case that he was discriminated against because of his sexual orientation. Well, there's agreement that the decision maker didn't know his sexual orientation. That's undisputed, right? Well, we believe it is undisputed. Plaintiff attempted to controvert that fact, but we believe that it is undisputed, and in the record, we believe that that's established, that it is undisputed, that both the decision maker for the promotion did not know he was gay and that the decision maker for the termination did not know he was gay. And in this situation, the plaintiff hadn't even alleged any evidence or hadn't even alleged that he was discriminated against because of his sexual orientation. Nowhere in plaintiff's amended complaint, which is in the record at 827, does it even mention that the plaintiff is gay, but he does reference sex stereotyping on eight occasions. Now, regardless of that, even if Bostock applies, the outcome here would be the exact same. So with respect to the AU position that the plaintiff is contending he was denied because of his failure to conform to sex stereotypes, there are two open positions that were in Phoenix. The plaintiff was one of 10 making the decisions, and when plaintiff's supervisor, Jared Shelton, ended up finding out that the plaintiff had applied for this position, Mr. Shelton actually went to the hiring manager, Mr. Radliff, and put in a good word for plaintiff, told him that the plaintiff could move to Phoenix quickly, he had no children, and he owned a condo that he could easily sell, and he'd be a great choice for this position. Now, the plaintiff refers to this as some type of improper prescreen, but after interviewing for the position, as the judge pointed out, Mr. Radliff hired a female, Brittany Harris, and Mr. Chavez, concluding that they were more qualified applicants. On April 23rd of 2008, Mr. Radliff then met with the plaintiff personally to end up telling him why he did not get this position. Now, fortunately, in this case, the plaintiff surreptitiously recorded that conversation, so we know exactly what was said, and the context of the statement that was made is that Mr. Radliff was talking to the plaintiff about how he did not showcase his leadership skills as good as the other candidates, and his comment exactly was, he might be a good candidate in the future because, quote, in the future, I might not meet a leader, I might have a bunch of alphas over there. Now, that comment has absolutely nothing to do with sex stereotypes, but the plaintiff has latched onto that comment as the catalyst for his claims. Now, with respect to this AU position, plaintiff's testimony was very clear. The plaintiff testified, the question that was asked to him was, so other than Mr. Radliff making a comment about alphas, Ms. Siebers, knowing that you were gay, according to you, and the prescreen discussion between Mr. Radliff and Mr. Shelton, do you have any other information or knowledge that you were not given the AU position in Phoenix in April 2018 because of your sexual orientation or failure to conform to male sex stereotypes? Answer, no. None of those three pieces of evidence carry the day. As the court noted, the comment about alphas is clearly something that at best for plaintiff is subject to two meanings. But the reality is, is that in the context in which it was made, it was clearly a reference to leadership abilities. The Tabor case is clear. If the context of the statement can be viewed in two different ways, it is not a direct evidence of discrimination. So as I said, at best for plaintiff, that is a comment that can be interpreted in two different ways. Let me ask you about the retaliation claim for a minute. One of the arguments is that, contrary to your disciplinary policy, that the defendant went straight to a final warning without engaging in any progressive discipline, and that that's evidence of retaliation. What's your position on that? That is not evidence. Our position is that is not evidence of retaliation in any way. Why not? Well, and the reason for it is, is that so in terms of the, in terms of the final warning, which is where that issue comes up. First of all, we don't even believe that the plaintiff, the plaintiff has established a prima facie case in that situation. But in terms of the burden shifting analysis, the plaintiff has pointed out to try to show pretext of in a number of different ways. One of the pretexts that he argues is you went straight to a final warning instead of some lesser degree of discipline. First of all, there is absolutely nothing in farmers policies and the defendant's policies that require a move to any type of progressive discipline. The progressive discipline policy says here's what we normally do. But depending upon the circumstances, we might end up skipping any level of these of these provisions. There's also absolutely nothing in the law that requires that a party, a defendant, or an employer end up referring to going through any kind of progressive discipline. So the fact that the company in this situation ended up going directly to a final warning is not evidence of any kind of inconsistency or pretext. Most importantly, in this case, Judge, is that Mr. Shelton became the plaintiff's supervisor in March of 2018 by May of 2018. So just three months later, when the final warning was issued, it is uncontroverted in this case that during that three month period that Mr. Shelton met with the plaintiff on at least eight separate occasions and ended up demonstrating to him, Mr. Thomas, here's how you're not doing your job correctly. Here's how you are letting your anger show when you talk to people on the phone. Here is how you are not showing empathy when you were talking to people on the phone. And so we had all of those counseling sessions. But Mr. Holland, those comments you referred to are not the only comments. There are at least four comments between June and October 19 that are favorable to the plaintiff saying, good job. You're a rock star, I think was one of the references. You can't just say what you just recited is the only evidence. There's a conflict in that evidence. No, but there's no conflict, Judge. I don't believe there is a conflict. So first of all, the dates that you're referring to go towards the termination. Back onto the final warning, though, there were positive comments. Oh, yeah, yeah, right. Determination, which is a retaliation claim. Well, there were positive comments about him as well. But Judge, the fact that a supervisor might make a positive comment about the nuts and bolts of how somebody is doing their job doesn't mean that it's inconsistent for the supervisor to criticize them when they don't do well. Otherwise, every time a supervisor says anything positive about an employee, all of a sudden there's now going to be pretext. And I don't let me ask this, accepting that to be true, given that here there are at least four positive comments. Doesn't that reflect at least on the proposition that that under these circumstances, you would expect them to use progressive termination? And they didn't do that. And therefore, there's an improper motivation. I would not agree with that in this situation, Judge, because you have to look at the facts of what happened on May 17th that led to the final warning and then what happened in October that led to the termination. And by that, I mean this. On May 17th, what happened May 17th of 2018, the plaintiff ended up emailing his supervisor, Mr. Shelton, about whether or not a certain type of document should be accepted for an insurance change. Mr. Shelton ended up emailing the plaintiff and explained, here's why we ought to accept this. The plaintiff's response to that was completely inappropriate. He ends up emailing his supervisor, outlining why he thinks he's wrong. And then when his supervisor is meeting with him, he gets up and walks out of that meeting as the supervisor is trying to coach him. And as I understand it, in that situation, the document that he didn't accept, his non-acceptance of it was consistent with company policy. Isn't that correct? That is not correct, Judge. And again, I think that you're referring to two different things. On the final warning, the document that was not accepted was something that should have been accepted. You're talking about something that then later happened in October that led to his termination. And if you move to the situation in October, the document that the plaintiff did not accept, you're correct. That was a document that, per the company policy, was probably not something that would have been accepted. But the job of these claims, these people in Mr. Thomas's position, their job is not to simply follow the rote policy. Their job is to try and help out the agents when they call. So your position on the May 17th is that the conduct and Mr. Thomas's reaction to that when confronted with it was so egregious that that's what led to the final warning. Exactly, Judge. And that was the point that I was making with Judge Murphy's question. And so if we don't accept that it was that egregious, or as Judge Murphy has pointed out, we see a mixed record of reviews as far as customer relations and dealing with agents, then is that subject to question? That that's real? That that's why he got the final warning? I don't believe so, Judge. And the reason for that is because the plaintiff still has to come forward with pretext. And in this case, the plaintiff clearly admitted that the only evidence he had that his final warning was retaliatory was that he had complained beforehand. The plaintiff's testimony on that point was he was asked the question, What evidence do you have? What information or knowledge do you have that your final warning was issued to you? We'll call it in retaliation. Here it is. I'll read it. This is in the appendix at page 179. Other than the fact that Exhibit 27, the final warning came after you complained to human resources and the fact that you believe Jared knew about your complaint to human resources. Do you have any other information or knowledge that farmers issued you the final notice Exhibit number 27 in retaliation for the fact that you had complained to HR answer? I don't know. So simply coming forth and saying, Well, because I complained, I now have a green light for any discipline that is issued to me after the fact simply does not rise to the level of pretext. So in the situation that the prior communications, the eight counselings that Mr Shelton had with the plaintiff in this case, those are simply a waiver for where the where the company was at the time in trying to deal with the plaintiff. But I would submit to you that even without those prior warnings, because of the plaintiff's behavior of simply getting up and walking out on a meeting, that would be something that the company can exercise its discretion and say, We're going to a final warning. We can disagree with that decision. The court can disagree with that decision and say, Well, if I was the one that was making that call, I might not have gone to a final warning. But there still has to be evidence that Mr Shelton in some way took that action because the plaintiff had complained. And there simply is no evidence in this case of that. Judge Murphy, did Mr Thomas dispute the characterization of him abruptly getting up and leaving the May 17 meeting? He Well, he did not dispute the actual end of that. He ended up disputing that. He says, Well, I thought the meeting was over because you told me to accept the document. And so I got up and left. But he does not dispute that the meeting was still going on at the time that they were having that Mr Shelton was still talking to him at that time. Well, the way you explain it sounded like, at least from his perception, he did think the meeting was over. He claimed that the reason he thought it was over was, Well, you told me to accept the document, so there really wasn't anything else for me to talk to you about. That was the way that the plaintiff's testimony was. Not that the content and context of the meeting was over. But, well, once you told me to accept something, I'm gonna accept it. I'm going back to work. I'm out of here. That was basically the testimony in this situation. Is that meeting recorded? No, ma'am, that is not a meeting that is recorded. That's not one of the final call that ended in termination. That is recorded. We have that. Well, yes, the agent. Right. The call with the agent is actually reported, and that is in the October 24th with Sims is not recorded, right? No, that one. That one is recorded as well, Judge. And that one is also part of the record. So the recording with and I see my time is up, but very briefly, the call with the call with the agent that resulted in the termination is part of the record because farmers reports all of those calls. And then the recording with Mr Sims and another supervisor meeting with the plaintiff to discuss that that meeting is also reported because the plaintiff secretly recorded that as well. And that's part of the record. Is there a policy in the record about when and under what circumstances they should record meetings? Are you talking about when an employee should record meetings? Is there anything in the record in the policy manual or otherwise that indicates a company policy on when supervisors should record meetings? No, there isn't. But, Judge, I want to clarify. No supervisor ever recorded a meeting here. The recordings, the only recording that farmers made that is part of the record is the phone call with the agent because that's it's a call center. So those calls are recorded. So the October 25th recording is recorded by the plaintiff? That is it's October 24th, Judge, and it was a recording by the plaintiff. Yes. And the meeting with the fellow who did the hiring that was also recorded by the plaintiff? Yes, sir. All right. Thank you. That was helpful. Thank you, Judge. Mr. Edelman, you have some time remaining. Thank you, Your Honors. And just very briefly, the counsel referenced the depositions and some statements in the depositions. It's important to note a couple things. First of all, plaintiff's deposition was taken prior to the taking of any other deposition. So when the question is, what evidence does he have of X, Y, or Z, the discovery wasn't closed at that point. There was, you know, further evidence was acquired and developed. So to somehow say that, well, he can't say that there's any other evidence of anything because of that statement of position. Again, I don't think it's supported by the record. I don't think it's supported by the facts. I don't and there's no case law that I've seen that supports, you know, a party's ability to sort of do that and close that off at that point. In terms of the progressive discipline, you know, the fact remains, again, it's not just the existence of it, but there was also testimony from one of the supervisors that they do usually and almost always use this progressive discipline. So it does go to this question of consistency and a question of, you know, what was really their practice, right? And so, yes, it's true that nothing says that they have to follow it, but the fact that they didn't is evidence of pretext, right? It's evidence that this wasn't really about what they say it's about. And the same is true with this final written warning, now the defendant is trying to say, well, you know, he did this thing at this meeting and that was so bad, that's all we need. But there's a physical, there's a document, right? Which says the final written warning and nowhere in that document, nowhere in any, in Mr. Shelton's testimony does he say that, right? Does he say, hey, this was itself enough, right? And really, it doesn't, any of the other things don't matter. He put all those other things and so that brings those into issue and where we can show that he didn't really believe those, that goes to, again, these, the lack of credibility and those are key elements of pretext. My time is up. Thank you, your honors, unless you have any questions. Thank you, counsel, for your arguments. The case is submitted and counsel are excused.